**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 227 WDA 2023 |

Appeal from the Order Entered January 18, 2023
In the Court of Common Pleas of Allegheny County
Family Court at No:  CP-02-AP-0000091-2022

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:              **FILED:  September 28, 2023**

M.B. ("Father") appeals from the January 18, 2023 order in the Court of Common Pleas of Allegheny County involuntarily terminating his parental rights to his daughter, M.B. ("Child"), born in February of 2016.  We affirm.

This appeal arises from the petition filed by Allegheny County Office for Children, Youth & Families ("CYF") on July 21, 2022, for the involuntary termination of Father's parental rights.  The evidentiary hearing occurred on January 12, 2023, when Child was six years old and in first grade.[1]

---

[1] The orphans' court appointed KidsVoice, an agency in Allegheny County which represents dependent children, to represent Child's legal interests in the involuntary termination proceeding.  An attorney from this agency represented both the legal and best interests of Child during the subject proceeding, and the record indicates that no conflict between Child's interests existed.  **See** N.T., 1/12/23, at 4; **see also In re T.S.**, 192 A.3d 1080, 1092
*(Footnote Continued Next Page)*

The following relevant facts and procedural history are undisputed.[2] For the initial months of her life, Child resided with S.J. ("Mother") in an inpatient facility that administered methadone to Mother in connection with her drug addiction. N.T., 1/12/23, at 10-12. On November 3, 2016, Mother died from a drug overdose after her discharge from the facility and while living in Father's home with Child in her care. *Id.* at 12. Father then raised Child alone until September of 2018, when his girlfriend, A. ("Stepmother"), began living with him. *Id.* at 16. Father married Stepmother on an unspecified date in 2019. *Id.* at 18.

In February of 2019, CYF received a report alleging substance abuse and domestic violence in this family's home. *Id.* at 15. Upon investigation, CYF observed that Child, then three years old, had a "red mark on her cheek and neck," which Father indicated were caused by the family dogs. *Id.* at 16.

---

(Pa. 2018) (reiterating that a child in a contested involuntary termination of parental rights proceeding has a statutory right to appointment of legal counsel under 23 Pa.C.S.A. § 2313(a) and "where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."); ***In re K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020) ("where an orphans' court has appointed a GAL/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict.").

[2] CYF presented the testimony of Ms. Joey Manuel, the case supervisor for this family from April of 2021, to September of 2022; Terry O'Hara, Ph.D., *via* video, who performed psychological evaluations on both Father and Child's kinship parents; and J.B., Father's sister with whom Child has resided in kinship foster care since April of 2021. Father testified on his own behalf.

In addition, Father revealed to CYF that Stepmother "handled 100 percent of [Child's] discipline." *Id.* CYF did not open a case for services to the family at that time.

In February of 2020, CYF received a report alleging that Child was physically injured and that her physical needs were not being met. *Id.* at 16. Upon investigation, CYF observed that now four-year-old Child had "a black eye and a bruise." *Id.* at 17. According to Ms. Manuel, the CYF supervisor, Child "was reporting that she either fell down the steps or simply fell." *Id.* Father explained Child was primarily in Stepmother's care due to his work schedule, and Ms. Manuel stated that Father "had little insight into if [Child] had actually fallen or what occurred." *Id.* at 17-18. Moreover, Father informed CYF that Child was "self-harming," and he believed Child's behavior "was attention-seeking because she was jealous of the relationship [between Stepmother] and" his baby daughter with Stepmother.[3] *Id.* at 17, 89.

Father further revealed that Stepmother wanted Child evaluated for autism. *Id.* at 18. Ms. Manuel testified that Father "stated he didn't see any issues with [Child], but he was agreeing to it because it was what [Stepmother] wanted." *Id.* Because Father and Stepmother were taking steps to have Child evaluated, CYF again did not open a case on this family. *Id.*

---

[3] The certified record does not reveal this child's date of birth. As best we can discern, she was born at the beginning of 2020.

Finally, CYF received a report on January 13, 2021, which resulted in CYF opening a case for services. The report alleged that Child was treated in the emergency room for a head laceration and bruising. *Id.* at 19. According to Ms. Manuel, the next day another report was made to CYF alleging that Child's injuries were more severe including a "possible concussion, significant bruising and bite marks." *Id.* Ms. Manuel testified that Child "claimed she hit herself in the shower." *Id.* at 20. Stepmother reported that Child's injuries were caused by her "thrash[ing] around" in the shower. *Id.* Father reported that the alleged incident happened when he was at work. *Id.* at 21. Father confirmed that Child "did thrash around when she was upset." *Id.* at 21.

CYF opened the case for this family on February 26, 2021. *Id.* at 24. CYF initially implemented a 30-day period of intensive in-home service for the family for the purpose of helping Child "learn some emotional management skills for her own safety." *Id.* at 22-23. However, Child continued to sustain injuries during that time, although they were described by Ms. Manuel as "minor injuries, a little bit of bruising and some red marks, but she had no injuries to her face." *Id.* at 23-24.

On April 8, 2021, two days after the in-home services ended, Father and Stepmother admitted Child to a psychiatric hospital. *Id.* at 24-25. Ms. Manuel testified that a caseworker visited Child in the hospital and observed that she "had bruising on her face, and she had a large abrasion below her eye that was clearly recent. It was . . . still red and . . . bleeding a little bit." *Id.* at

24. Ms. Manuel stated that Child "indicated that she did it to herself. . . . [W]hen we probed further and asked her exactly how she caused the injury to her eye, she really couldn't say other than . . . she kept repeating, I pinched myself." *Id.* at 25.

Ms. Manuel spoke to the treating physician at the psychiatric hospital, who "expressed pretty significant concern for" Child. *Id.* at 27. According to Ms. Manuel, the hospital staff was "not seeing the behaviors [from Child] that had been reported [by Father and Stepmother]. [The hospital staff] were seeing [Child] to be pretty compliant and emotionally regulated." *Id.*

Specifically, Ms. Manuel described Father's explanation for Child's admission to the psychiatric hospital, as follows.

> [W]hen he arrived home on April 8th [Stepmother] reported to him that it had been a particularly bad day at the home.
>
> He observed the injury to [Child]'s eye, and [Stepmother] said that [Child] had done that to herself. He said when he arrived home, [Stepmother] appeared to be at wit's end. [Child] was out of control, and he agreed with [Stepmother] that [Child] needed to be hospitalized at [the psychiatric hospital].

*Id.* at 25.

On April 14, 2021, the juvenile court issued an order placing Child in the emergency protective custody of CYF.[4] *Id.*; *see also* CYF Exhibit 3. On April

---

[4] Child's younger half-sister, then approximately one-year-old, was also removed from Father's home at that time. N.T., 1/12/23, at 30. She is not a subject of this appeal.

- 5 -

16, 2021, upon discharge from the psychiatric hospital, Child was placed in kinship care with her paternal aunt and uncle. *Id.* at 30-31. Since Child's placement, CYF has not received any reports of Child suffering further injuries. *Id.* at 28.

The Honorable Jennifer McCrady adjudicated Child dependent on May 24, 2021, and found her to be a victim of "child abuse" pursuant to 23 Pa.C.S.A. § 6303.[5] During the subject proceeding, CYF introduced Child's dependency record as Exhibit 3, which the orphans' court admitted. The adjudication order contained extensive findings, which we relate, in part:

> The totality of the testimony provided today . . . demonstrated that [Child] has not been independently observed to have self-injurious behaviors that [Father and Stepmother] claimed to be the source of the injuries, which occurred over the course of time, while in their care. Furthermore, it is this [c]ourt's finding that when [Child] is not in the care of [Father and Stepmother], such as her time inpatient at [the psychiatric hospital] or while in foster care, both the professionals and foster parents involved in this case have documented that [Child] has not sustained any additional injuries or evidence of self-injurious behavior. Therefore, it is the opinion of this [c]ourt that [Child] was the victim of intentional physical abuse and maltreatment by [Father and Stepmother]. This [c]ourt notes that neither [Father] [n]or [Stepmother] accepted any responsibility for inflicting these injuries[;] therefore, to the extent one of them was solely responsible for inflicting these injuries, it is apparent to the [c]ourt that the other was equally culpable as a perpetrator by omission, as these injuries were repeated, significant, and occurred while in their custody and control over a period of time. Finally, it is this [c]ourt's opinion that in order for [Father and Stepmother] to remedy the condition that led to the removal and adjudication of [Child], **this [c]ourt will want to see evidence of [Father]**

---

[5] Judge McCrady presided over both Child's dependency and the involuntary termination proceedings.

**directly acknowledging and remedying [his] role with respect to this finding, which may include addressing issues related to mental health, drug and alcohol use, and/or intimate partner violence**.

Orphans' Court Opinion, 3/15/23, at 7-8 (footnote omitted) (emphasis added); *see also* CYF Exhibit 3. As such, in furtherance of Child's permanency plan of reunification, the court required Father to participate in services related to mental health, anger management, substance abuse, and intimate partner violence. *See* N.T., 1/12/23, at 31-32. In addition, Father was required to participate in supervised visits with Child, which occurred twice weekly in the community. *See id.* at 58.

Father participated in a psychological evaluation with Dr. O'Hara. However, Father did not subsequently participate in the recommended mental health treatment or in any of the above-described requisite services. *See* N.T., 1/12/23, at 39. Father did attend supervised visits with Child, but the court found that he "engaged in questionable conduct and conversation with Child during several visits." Orphans' Court Opinion, 3/15/23, at 9-10 (citing *id.* at 62.)

Approximately six months after Child's adjudication, when she was five years old, Father was incarcerated in the Allegheny County jail on charges relating to an incident with the Ohio Township Police that was not fully

described in the certified record before this Court.[6]  **See** Orphans' Court Opinion, 3/15/23, at 10 (citing N.T., 1/12/23, at 40, 43, 180).  Specifically, Father was incarcerated from November of 2021, until July of 2022, when he was released to the Renewal Center, a halfway house.[7]  **See** N.T., 1/12/23, at 42, 180.

During his incarceration, Ms. Manuel testified that Father refused all visitation with Child, including virtual visitation.  **See id.** at 59-61.  Father did participate in a prison program that Ms. Manuel described "touches on eight different sort of factors," such as anger management and substance addiction, but "it's more of like a precursor to formal programming than actual formal programming."  **Id.** at 41-42.

As stated above, Father was released in July of 2022, to the Renewal Center where he participated in a dual diagnosis program ordered by the criminal court.  **See id.** at 42.  After his discharge from the Renewal Center, the date of which is not in the record, Father participated in an outpatient program at Jade Wellness, which was also ordered by the criminal court.  **Id.** at 42, 188-189.   Father, who was attending this program at the time of the

---

[6] CYF introduced, and the court admitted, Father's criminal dockets as Exhibit 2.  The dockets reveal, *inter alia*, that charges were lodged against Father for aggravated assault of two police officers.

[7] At the time of the involuntary termination proceeding, Father and Stepmother had criminal charges pending against them arising from their alleged physical abuse of Child.  N.T., 1/12/23, at 177.  There is no further evidence in the record relating to these criminal charges.

subject proceeding, described it as including group discussions that offer "an outlet . . . [a]nd these people listen to me, and some come up with suggestions." *Id.* at 188-189. Father was also participating in parenting classes at the time of the subject proceeding. *See id.* at 189.

On August 24, 2022, the juvenile court issued an order finding that aggravated circumstances existed as to Father due to Child being a victim of child abuse. *See id.* at 37. Further, the order no longer required CYF to provide reunification services to Father. *See id.*

In addition, Father was prohibited from visiting with Child due to a Protection from Abuse ("PFA") order that Child's paternal aunt and uncle obtained on her behalf. The record reveals that the PFA order has a three-year term which expires in August of 2025. *Id.* at 101. As such, by the time of the subject proceeding, approximately thirteen months had passed since Child last saw Father. *See id.* at 59-61, 101.

At the conclusion of the testimonial and documentary evidence, by order dated January 12, 2023, and docketed on January 18, 2023, the orphans' court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father timely filed a notice of appeal along with a concise statement of errors complained of on appeal. The orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a) on March 15, 2023.

On appeal, Father presents the following issues for review:

1. Whether the court erred in finding that Father refused or failed to form his parental duties for a period of six (6) months immediately preceding the filing of the petition to terminate his parental rights under 23 Pa.C.S.A. § 2511(a)(1).

2. Whether the court erred in finding sufficient evidence to terminate the parental rights of Father under 23 Pa.C.S.A. § 2511(a)(2) and that Father will not be able to remedy the condition which led to the removal of [C]hild within a reasonable amount of time.

3. Whether the court erred in finding sufficient evidence to terminate the parental rights of Father under 23 Pa.C.S.A. § 2511(a)(5) and the termination of parental rights was against the weight of evidence.

4. Whether the court erred by finding that [CYF] met its burden of proof in the termination proceedings under 23 Pa.C.S.A. § 2511(a)(8).

5. Whether the court erred by finding that termination of Father's parental rights serve the needs and welfare of Child.

Father's Brief at 1-2 (unpaginated).

We consider Father's issues in the context of determining whether the order is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123–1124.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Further, this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted).

To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable

a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (quoting **Matter of Adoption of Charles E.D.M., II**, 708 A.2d 88, 91 (Pa. 1998)).

Instantly, we analyze the involuntary termination order pursuant to Section 2511(a)(8) and (b):

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy Section 2511(a)(8), the petitioner must prove the following three elements: (1) that the child has been removed from the care of the

parent for at least 12 months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

With respect to the second element, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second element of Section 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the Section 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

This Court has recognized "that the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and

- 13 -

stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id.*

Regarding the third element of Section 2511(a)(8), that termination of parental rights would best serve the needs and welfare of the child, this Court has explained:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. *See In re R.J.S.*, 901 A.2d [502,] 508 [(Pa. Super. 2006)]. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008-1009 (Pa. Super. 2008) (*en banc*).

As stated above, the court "shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child" under

Section 2511(b), only if at least one of the statutory grounds for termination have been met under Section 2511(a). With respect to Section 2511(b), this Court has stated, "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." **C.L.G.**, 956 A.2d at 1009 (citation omitted). Specifically, we have explained that the court must "consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." **Id.** at 1009-1010 (citations omitted). Furthermore,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

**In re A.S.**, 11 A.3d 473, 483 (Pa. Super. 2010).

Instantly, because we are reviewing the decree pursuant to Section 2511(a)(8), we need only consider Father's fourth and fifth issues on appeal. **See In re Adoption of K.M.G.**, 219 A.3d at 672. Initially, we observe that Father's issues do not implicate Section 2511(b). Indeed, Father does not cite Section 2511(b) in the argument section of his brief. Thus, we conclude that Father has waived any claim with respect to Section 2511(b). **See In re M.Z.T.M.W.**, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any

- 15 -

discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

In his fourth and fifth issues, Father argues that the evidence was insufficient for termination under the third element of Section 2511(a)(8), that it would best serve the needs and welfare of Child. Specifically, Father asserts that the record lacks any testimony regarding the bond between him and Child. **See** Father's Brief at 28. In addition, Father speculates that Child's kinship care placement may not be permanent. As such, Father argues that Child's need for stability is not served by terminating his parental rights. **See id.** at 28-30. Father's claims are without merit.

Contrary to Father's argument, an orphans' court may terminate parental rights without "a detailed investigation into the bond between" the parent and child. Father's Brief at 28. Indeed, in determining whether a bond exists, expert testimony is not necessary. **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Further, this Court has stated that, in cases where there is no evidence of a bond between a parent and child, it is reasonable for the orphans' court to infer that no bond exists. **See In re K.Z.S.**, 946 A.2d 753, 762-763 (Pa. Super. 2008).

In this case, there is no evidence in the record that a bond exists between Child and Father. Child's kinship mother reported that Child "doesn't really say anything at all" about Father. N.T., 1/12/23, at 161. Child's kinship mother also testified that Child participates in therapy but "[s]he doesn't like

talking about" Father in therapy. *Id.* Ms. Manuel testified that Child looks to her kinship foster parents "as her parents at this point. . . . [S]he seems very bonded and happy there." *Id.* at 72. In addition, Ms. Manuel testified that Child's kinship parents are a pre-adoptive resource. *Id.* at 31.

Further, Ms. Manuel testified that Child's kinship foster parents meet both her educational and medical needs. *See id.* at 102. She stated that Child is "doing very well in school." *Id.* Similarly, Child's kinship mother described Child's progress as follows.

> [Child]'s doing wonderful[ly]. She has no disabilities that [Stepmother] talked about constantly. She's not autistic. She's not blind.
>
> [T]here's nothing wrong with her teeth. She has As and Bs in her classes. Her teachers love her. She's a great kid. . . . [T]here's nothing wrong with her, not one thing. Not one thing. There was never any evidence that she hurt herself, never.

*Id.* at 164.

Based on the foregoing testimonial evidence, the record amply supports the orphans' court finding that terminating Father's parental rights best serves Child's needs and welfare. *See* Orphans' Court Opinion, 3/15/23, at 18 ("Now six years old, twenty-two consecutive months in the care of a [kinship] foster home, and not having any contact with Father in nearly fourteen months, Child is a happy, healthy, well-adjusted first grader without any special educational or medical needs. The testimony supports the fact that this [kinship] foster home has provided her with the much needed love, stability, safety, and security. . . .").

With respect to Father's speculation that Child's placement with her kinship parents is not permanent, he is not entitled to relief. The Adoption Act expressly provides that "if the petitioner is an agency, the petitioner shall not be required to aver that an adoption is presently contemplated more than a person with the present intention to adopt exists." 23 Pa.C.S.A. § 2512(b)(3) (Petition for involuntary termination); *see also In re Adoption of B.J.R.*, 579 A.2d 906, 915 (Pa. Super. 1990) (stating that the involuntary termination of parental rights is not barred when there is no indication that the child welfare agency has found a prospective adoptive family).

Nevertheless, the only evidence in the certified record with respect to this issue comes from Dr. O'Hara who evaluated the kinship foster parents. Dr. O'Hara recommended that he re-evaluate them in three to four months, based solely on unspecified allegations made against the kinship parents by their adult daughters. *See* N.T., 1/12/23, at 141. As such, Dr. O'Hara recommended that they be re-evaluated to "make sure that things are going the way they should." *Id.*

We reject Father's bald assertion in his brief that he and other members of his extended family

> have grave concerns about Child's continual placement with her foster parents. Specifically, Father filed a petition seeking Child's removal from the care of foster parents due to their isolating behaviors, religious zealotry and refusal to facilitate Child's relationship with other members of the extended paternal family. This matter was scheduled for a hearing only one day before the contested termination hearing.

> Father presented evidence including the testimony of his two nieces who were raised by foster parents who felt that they were isolated, gaslit and emotionally abused by foster parents. Although the trial court did not take steps to remove Child from the care of foster parents, the evidence presented by Father was sufficient to raise concern and led to the trial court being more cautious in moving forward with a final adoption by foster parents.

Father's Brief at 29 (unpaginated) (unnecessary capitalization omitted). Father's assertion is based on alleged activity in Child's dependency case in juvenile court, which does not exist in the certified record regarding the subject termination proceeding in orphans' court.[8] Thus, because Father's argument is based on facts that are not in the certified record, his claim also fails. *See Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) ("[I]f a document is not in the certified record, the Superior Court may not consider it.").

In this case, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to Section 2511(a)(8). Ms. Manuel testified on cross-examination that Father has never acknowledged that Child was a victim of child abuse, as follows.

> Q. And have you talked to [Father] about that since he [has] been released from jail?
>
> A. Yes. I talked to him since [has] been released three times about that, and . . . [Father has] replied to me, ["]I don't know

_____

[8] Dependency and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas." *See Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021).

- 19 -

what to tell you because I did not hurt my child and I do not have any evidence that anyone did.["]

N.T., 1/12/23, at 96 (cleaned up).

Father testified on direct examination:

Q. You've heard [testimony] . . . that you have . . . not taken responsibility or acknowledged that [Child] was abused.

Did you learn anything while you were in the County Jail regarding [Child]'s abuse?

A. Well, I had plenty of time to think in there. . . .

. . .

Q. Do you acknowledge that [Stepmother] was harming your child?

A. I'm going to say, yes, at this point in time. I hear when she was with me, there [were] no incidents, and, yes, as soon as I brought my wife in, things started happening.

*Id.* at 182, 185. The orphans' court determined that Father "made very limited acknowledgements about his role" in Child's abuse during the termination proceeding. Orphans' Court Opinion, 3/15/23, at 21. The court concluded, "Father continues to lack the protective capacities and introspection necessary to best meet Child's needs and welfare." *Id.* Based on our thorough review of the record, we discern no abuse of discretion. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017) (stating that the second element of Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the

placement of the child).  Accordingly, we affirm the decree involuntarily terminating Father's parental rights.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  9/28/2023